**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID ESTEBAN AGUIRRE,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>CAROLYN W. COLVIN, Acting Commissioner of Social Security,<br><br>　　　　Defendant. | Case No. 1:12-cv-01961 SMS<br><br>ORDER AFFIRMING AGENCY'S DENIAL OF BENEFITS AND ORDERING JUDGMENT FOR COMMISSIONER |

Plaintiff David Esteban Aguirre ("Plaintiff"), by attorney Brian C. Shapiro, seeks review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability insurance benefits (DIB) under Title II of the Social Security Act. The Court finds the decision of the Administrative Law Judge ("ALJ") to be supported by substantial evidence in the record as a whole and based upon proper legal standards, and affirms.

**I.   Procedural History**

Plaintiff applied for benefits in January 5, 2010, claiming disability as of November 9, 2009. His application was denied initially and on redetermination. After a hearing on July 12, 2011, ALJ Sharon L. Madsen denied his application in a decision dated July 22, 2011. The Appeals Council denied review on September 25, 2012. Plaintiff filed his complaint in this Court on November 30, 2012 pursuant to 42 USC § 405(b)(1). The parties consented to magistrate jurisdiction and have submitted their cross-briefs without oral argument.

## II. Scope of Review

Congress has provided a limited scope of review of a decision to deny benefits. First, this Court reviews only the Commissioner's "final decision." 42 U.S.C. § 405(g). Here, because the Appeals Council denied review, that is the ALJ's decision. *Sims v. Apfel*, 530 U.S. 103, 106 (2000); *cf. Brewes v. Comm'r*, 682 F.3d 1157, 1161-62 (9th Cir. 2012) (describing limited consideration of Appeals Council's decision "as a practical matter"). Furthermore, this Court reviews only whether this decision applied proper legal standards and made findings supported by substantial evidence. *Bray v. Comm'r*, 554 F.3d 1219, 1222 (9th Cir. 2009). Substantial evidence is more than a scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id*. Where the record as a whole can support either grant or denial, the Court may not substitute its judgment. *Id*.

## III. Record

### April-July 2008 (*res judicata* period)

Plaintiff has previously applied for disability benefits; his application was denied in July 2008 at the initial level. AR 153, 325. Neither party addresses this prior denial, and the Court does not view it as creating an ongoing presumption of nondisability. *See Bennett v. Astrue*, 2013 WL 503933 (W.D. Wash. Jan. 18, 2013) (declining to decide whether initial denial created a presumption of nondisability); *see also Orta v. Colvin*, 1:12-CV-00837-SMS, 2013 WL 6047617 (E.D. Cal. Nov. 14, 2013). The Court summarizes the record from this period for background purposes only.

On April 3, 2008, Plaintiff presented as a new patient to Community Medical Providers. AR 235. His physical examination was completely normal except for a skin issue to be treated with Indomethacin. *Id*. He was diagnosed with a skin problem, depression, and hypertension. *Id*. On June 23, 2008, he returned for treatment. AR 234. Treatment notes are illegible. *Id*.

On July 1, 2008, Plaintiff underwent a psychiatric consultative examination with Dr. Shireen Damania, M.D. (AR 221-24) and an internal medicine examination with Dr. Rustom Damania, M.D. (AR 225-28). According to the psychiatric evaluation by Dr. S. Damania, records showed that Plaintiff had recently completed a 30-day inpatient alcohol rehabilitation program. AR

2

221. He admitted a long history of alcohol dependence, including time served in jail for driving under the influence. Although he had stayed sober for five months, he said he had drank a beer two days before the appointment. *Id*. He claimed he had not had any gainful employment since 2006 and that he had not had problems with street or unauthorized drugs in the past. AR 222.

He claimed he felt depressed and had sleeping problems, but denied suicidal thoughts. *Id*. He stated that his primary care physician was prescribing him Celexa, Indomethacin for gout and arthritis, Lisinopril, and Wellbutrin. *Id*. He also claimed to have "recurring pancreatitis" due to his alcohol dependence. *Id*. Plaintiff denied having a full-time job since delivering tortillas about ten years earlier, although he admitted doing seasonal work for the State of California. *Id*. In terms of daily activities, Plaintiff admitted sweeping, volunteering at his church, interacting with his children and grandchildren, and helping his wife perform errands and chores when he felt good. *Id*. He said he did not drive an automobile. *Id*.

On mental status examination of Plaintiff, mood was depressed, affect was appropriate, he denied suicidal thoughts, impulse control and frustration tolerance were within normal limits, there was no evidence of hallucinations or delusions, memory for recent and past recall was intact, intelligence was average, he was aware of current events, he could do simple mathematics, and insight and judgment were adequate. AR 223. He was diagnosed with depressive disorder, not otherwise specified, and alcohol dependence. *Id*. His current global assessment of functioning (GAF) was 55. *Id*.[1] Plaintiff would have difficulty with the following: interpersonal skills and social functioning; concentration, persistence and pace in a work-like setting; responding appropriately to coworkers, supervisors, and the public; and responding appropriately to usual work situations and dealing with changes in a routine work setting with normal supervisors. AR 223-24. He could understand, carry out, and remember simple one- and two-step job instructions, but not on a consistent basis. AR 224.

---

[1] GAF described a patient's overall level of mental functioning. A GAF score of 51 to 60 indicated "[m]oderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2002) (DSM-IV). In 2013, the American Psychiatric Association (APA) dropped GAF from its multiaxial diagnostic system "for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) (DSM-V).

Also on July 1, 2008, Rustom Damania, M.D., performed a consultative internal medicine examination. AR 225-28. Plaintiff alleged that he had been unemployed for fifteen years, although he admitted babysitting his grandchildren until February 2008. AR 225. Plaintiff complained of chronic body pain and joint pain, pain in the left knee, acute pancreatitis with four hospitalizations in the past two years secondary to alcohol, and hypertension. AR 225. Dr. R. Damania deemed Plaintiff's complaint of a history of gout "[q]uestionable." *Id*. Plaintiff said that his daily activities included doing dishes, vacuuming, and cleaning. *Id*. He was not seeing a psychiatrist. AR 226.

On physical examination, he was cooperative and pleasant and in no acute distress or discomfort. AR 226. He had normal breath and heart sounds, his coordination was normal, station and gait were normal, and posture was normal. AR 226-27. Ranges of motions in all joints were normal, and there was no evidence of muscle spasm or tenderness. AR 227. He had full motor strength in his upper and lower extremities with no evidence of muscle atrophy. AR 228. He had a visual impairment that could be corrected with eyeglasses. AR 228.

Dr. R. Damania diagnosed alcohol dependency, arthralgias of undetermined etiology; acute pancreatitis times four times in the past two years, secondary to alcoholism; and hypertension. *Id*. He opined that Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently and stand, walk, and sit without restriction. *Id*.

In July 2008, this prior disability application was denied at the initial level. AR 153, 325.

**July 2008-November 2009: Period Prior to Alleged Disability Date**

On March 30, 2009, Plaintiff returned to Community Medical Providers for follow-up and refills. AR 233. He was noted to be an "active alcoholic" who had recently been released from rehabilitation, after multiple previous rehabilitations. *Id*. Plaintiff stated that Wellbutrin was helping his depression, but not Celexa. *Id*. The provider noted that, despite a past history of bipolar disorder, Plaintiff had never received treatment for that condition. His multi-system examination was normal except for flat affect and sad mood. *Id*. The provider assessed depression and alcoholism, and strongly advised Plaintiff to attend Alcoholics Anonymous meetings. *Id*.

At the next appointment with Community Medical Providers (date unreadable—probably May 2009), Plaintiff complained that his insomnia worsened after stopping Celexa. AR 232. He

said his depression was about the same. *Id*. Plaintiff alleged that feelings of sadness went in "spurts." *Id*. The provider assessed insomnia and depression with a history of bipolar disorder. *Id*. The provider prescribed Lamictal. *Id*. On July 6, 2009, Plaintiff followed up with Community Medical Providers. AR 231. Plaintiff reported that he felt fine. The provider noted that Plaintiff's mood seemed more stable. *Id*. Plaintiff complained that, despite sleeping a lot, he had no energy and felt fatigued, and that Lamictal had made him "mean." *Id*. He alleged having decreased memory, tremors, twitch/jerking of the legs, and decreased attention span. *Id*. His multi-system examination was normal except for flat affect. *Id*. He was started on Depakote and assessed with malaise, possibly secondary to depression, and bipolar disorder. *Id*.

Richard Guzzetta, M.D., a family and addiction medicine physician, met with Plaintiff on June 30, 2009. AR 253-58. Dr. Guzzetta noted that Plaintiff was bipolar by history, but did not note any previous psychiatric treatment or hospitalizations. AR 253. Plaintiff had no suicidal thoughts or hallucinations; claimed he could not sleep during alcohol withdrawals; and had his last drink a week ago. AR 254. He was drinking a six-pack of beer daily, along with a pint of vodka. *Id*. He denied using illegal drugs. *Id*. He denied seizures, strokes, muscle or joint problems, and any previous rashes or skin infections. AR 255-56.

On physical examination, he had no swelling, tenderness, or deformity in his extremities; muscle tone and bulk were normal; there was no evidence of gait abnormality; and there was no evidence of movement abnormality. AR 256-57. On mental status examination, he sat calmly, was awake and oriented, and had normal cognitive functioning. AR 257. His recent and remote memory were intact, intelligence was average to above average, attention span was normal, mood was euthymic, affect was broad, speech was normal, and thoughts were goal-oriented. AR 257-58. Insight, judgment, and impulse control were reportedly poor, however. AR 257-58. Dr. Guzzetta assessed alcohol dependence and bipolar disorder by history and estimated a GAF of 45. AR 258.[2] He started Plaintiff on Depakote and began an outpatient program. *Id*.

---

[2] A GAF of 41 to 50 indicated "serious symptoms (e.g., suicidal ideation, severe obsessional ritual, frequent shoplifting) or serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)". See DSM-IV 32. Again, the APA dropped GAF from its multiaxial diagnostic system in 2013. DSM-V, "The Multiaxial System."

In August 2009, Dr. Guzzetta observed Plaintiff was doing better on Seroquel and noted that the insurance company wanted him to see a psychiatrist. AR 250. He assessed bipolar disorder. *Id*.

On September 8, 2009, Plaintiff visited Community Medical Providers and complained of fatigue, depression, and sleeping problems. AR 230. The provider noted that Plaintiff's depression control had improved. *Id*. The provider wrote "? leg movement." *Id*. A multisystem examination was normal except for flat affect. *Id*. Plaintiff was assessed with fatigue, alcoholism, and depression. *Id*. The provider prescribed Depakote, Wellbutrin, Celexa, Seroquel, and Campral. *Id*.

**November 2009-May 2010: Date of Alleged Onset Through Initial Denial**

On November 13, 2009, at an appointment for medication management, Dr. Guzzetta noted Plaintiff was attending Alcoholics Anonymous three times per week; had a sobriety date of March 20, 2009; and admitted thoughts about drinking. AR 249. The doctor assessed him as stable. *Id*.

On December 17, 2009, Plaintiff protectively filed the disability application in this case, a Title II application alleging disability beginning November 9, 2009. His claimed impairments were bipolar disorder and depression. AR 157.

On December 22, 2009, Plaintiff complained to Dr. Guzzetta of muscle twitches. AR 248. Dr. Guzzetta assessed questionable "EPS" (epileptic seizures). *Id*. In January 2010, Plaintiff complained of severe depression, insomnia, and loss of appetite. AR 247. However, Dr. Guzzetta noted that Plaintiff was "off Seroquel." *Id*. The doctor assessed bipolar disorder. *Id*.

Steven Stoltz, M.D., performed an internal medicine consultative examination on March 26, 2010. AR 261-65. Plaintiff complained of having gouty arthritis for many years with flare-ups occurring once every two weeks in his great toes and ankles. AR 261. He also complained of pain in his left hip and thigh, especially worse with walking, and morning joint stiffness. *Id*. Plaintiff was taking anti-inflammatory medication for his pain, but not Allopurinol. *Id*. In addition, he had a left knee ligament repair seven years earlier. *Id*. He had a history of alcoholism with previous hospitalizations, even requiring ventilator assistance. *Id*.

During a review of symptoms, he alleged tinnitus and "twitching" but admitted no history of Parkinsonism, stroke, transient ischemic attack, or multiple sclerosis. AR 262-63. On physical examination, Dr. Stoltz described Plaintiff as a "well-nourished, healthy-appearing male in no

1  distress." AR 263. He had flat affect and seemed to have a slight resting tremor. Range of motion
2  testing was all within normal limits. AR 263-64. His knees were normal, with no crepitus and no
3  patellar instability. AR 264. He had full motor strength in all extremities, good tone with active
4  motion, intact sensation, and normal reflexes. AR 265. Dr. Stoltz diagnosed psychiatric impairment,
5  gouty arthritis, alcoholism, and tinnitus. AR 265. He opined that Plaintiff did not have "any medical
6  impairment to work activities." *Id*.

Psychologist James Murphy, Ph.D., performed a consultative examination of Plaintiff on April 8, 2010. AR 267-72. Dr. Murphy observed that Plaintiff appeared in no acute distress, his clothing and hygiene were neat and appropriate, and he had unremarkable motor activity. AR 267. His chief complaint was inability to work due to bipolar disorder and depression. *Id*. Plaintiff alleged attempting suicide three times in the past, most recently in 2008, but denied any thoughts or plans to attempt suicide currently or in the future time. *Id*. Plaintiff admitted a history of drinking alcohol since age 14, mainly beer and vodka, but claimed that he had not consumed a drink since March 27, 2009. *Id*. Plaintiff also admitted that, until three years prior, he had been using illegal drugs such as marijuana, methamphetamine, and cocaine. AR 267-68. He claimed to have participated in six different substance abuse programs but could not identify any dates and continued to use the entire time. AR 268, 271.

On mental status examination, his attention was within normal limits, his short-term and remote memory were intact, and his attitude toward Dr. Murphy and clinical testing was guarded and uncooperative. AR 268. Plaintiff described his mood as "aggravated," and his emotional expression was congruent to his reported mood. *Id*. Insight, judgment, and motivation were appropriate; he was cooperative regarding tasks asked of him; and, although he was a very poor historian, he was able to handle ideas well and could identify basic similarities, differences, and absurdities. *Id*.

On intelligence testing, he scored in the borderline level of intelligence. AR 269-70. In assessing Plaintiff's functionality, Dr. Murphy observed that although Plaintiff's test scores were quite low and fit his level of functioning overall, "everything is probably skewed because of the heavy substance abuse." AR 270-71. Specifically, Dr. Murphy observed that Plaintiff's past

7

addiction to illegal drugs and alcohol were "quite severe and there is only his word that it is no longer a problem." AR 271. Dr. Murphy expressly noted Plaintiff's "lack of desire to return to work." AR 271. Dr. Murphy also observed that there were "no symptoms of a Bipolar Disorder or Depression observed during the interview and testing session." AR 271.

Dr. Murphy diagnosed rule-out polysubstance dependence, not in remission; rule out alcohol dependence, not in remission; and rule out substance induced persisting dementia. AR 271.[3] Dr. Murphy opined that Plaintiff's social judgment and awareness of socially appropriate behavior and his ability to accept instructions from a supervisor and respond appropriately to criticism were all within normal limits. *Id*. Dr. Murphy opined that Plaintiff was mildly impaired in his abilities to remember location and repetitive tasks and understand and remember simple instructions. *Id*.

Dr. Murphy opined that Plaintiff was moderately impaired in his abilities to maintain attention and concentration for extended periods; understand and remember complex instructions; perform activities within a schedule, maintain regular attendance, and be punctual; function independently and sustain an ordinary routine without special supervision; complete a normal workday and workweek without interruptions from psychologically based symptoms; and perform at a consistent pace. *Id*. Dr. Murphy also stated that Plaintiff's ability to withstand the stress of a routine workday and deal with the various changes in the work setting was impaired, but did not specify the degree of impairment. *Id*. Dr. Murphy concluded that there was little likelihood that Plaintiff would emotionally deteriorate in a work environment. *Id*.

Based on Plaintiff's statements, Dr. Murphy was under the impression that Plaintiff was unable to handle activities of daily living such as bathing, eating meals, and socializing. AR 272. Dr. Murphy opined that Plaintiff appeared to understand and follow simple, basic instructions, with some minor difficulty, and that the majority of his difficulty stemmed from his heavy abuse of illegal drugs and alcohol, which might be continuing unabated. *Id*.

On April 26, 2010, J. Hartman, M.D., a state agency physician, reviewed the medical evidence of record and opined that Plaintiff had no severe physical impairments. AR 325-27. On

---

[3] A rule-out notation means there is good evidence the patient meets the diagnostic criteria, and the doctor needs more information to rule out the diagnosis. *See Hensen ex rel. J.H. v. Republic R-III Sch. Dist.*, 632 F.3d 1024, 1027 n.3 (8th Cir. 2011); *United States v. Grape*, 549 F.3d 591, 593 n.2 (3d Cir. 2008).

May 18, 2010, Stephen Fair, Ph.D., a state agency psychologist, opined that Plaintiff could perform routine, simple work in a setting with limited contact with others. AR 273-291. Also on May 18, 2010, Plaintiff's application was denied at the initial level. AR 56.

### May-September 2010: Records Between Initial Denial and Reconsideration Denial

On July 8, 2010, Dr. Guzzetta referred Plaintiff to Abbas Mehdi, M.D., for a neurological consultation and evaluation of tremors. AR 293-95. Plaintiff complained of tremors and shakes in his hand and body along with twitches since being hospitalized for complications of alcohol intoxication one and a half years earlier. AR 293. He claimed he had been alcohol free since his discharge. *Id*. He described his tremors as postural or intentional, such that they only occurred when he was holding an object such as a cup of coffee or writing. *Id*. Plaintiff also alleged a jerky hand of his hand that he attributed to Seroquel. *Id*. He denied a resting tremor. Plaintiff also complained of back pain, left hip pain, and leg problems. *Id*. Plaintiff denied any significant cognitive decline, and stated that he could perform activities of daily living without any assistance or problems. *Id*.

On physical examination, Plaintiff was cooperative and in no acute distress and was deemed a reliable historian. AR 294. Dr. Mehdi found normal range of motion of the musculoskeletal joints, with no joint deformity. *Id*. Plaintiff had a normal mental status examination, and he was able to follow complex commands. *Id*. His motor strength was full in all four extremities. *Id*. He had prominent tremors, intentional and postural, suggestive of essential benign tremors, but there was no resting tremor. *Id*. Plaintiff's sensory examination was normal. *Id*. Plaintiff walked with a normal gait without any sign of incoordination. AR 295.

Dr. Mehdi told Plaintiff that he did not have Parkinson's disease and educated him about benign essential tremors and postural or intentional tremors. AR 295. The doctor recommended Primedone, a seizure medication, but advised Plaintiff to consult with his psychiatrist because he was already taking two anti-seizure medications for reasons other than seizures. *Id*. Dr. Mehdi also recommended routine magnetic resonance imaging (MRI) of the brain. *Id*.

On July 13, 2010, Jagmeet Chann, M.D., a psychiatrist, evaluated Plaintiff at the request of Dr. Guzzetta. AR 321-24. Plaintiff complained of sleeping problems, although he admitted he sometimes felt good. AR 321. On mental status examination, Plaintiff had appropriate eye contact,

average psychomotor activity, and spontaneous speech, and was cooperative. AR 323. Dr. Chann checked fearful, anxious, and dysphoric mood. AR 323. Plaintiff had no perceptual abnormalities. *Id*. Dr. Chann noted thoughts of worthlessness and grandiose delusions, but also goal-directed thought processes. *Id*. Plaintiff displayed fair attention/concentration and variable distractibility; however, his cognition, insight, and judgment were intact, and his intelligence was average. *Id*. Dr. Chann diagnosed him with major depression, mood disorder, and alcohol dependence. AR 324.

On July 21, 2010, Plaintiff requested reconsideration of the initial decision. AR 72.

An MRI of Plaintiff's brain obtained on August 10, 2010, revealed a T2 signal abnormality in the white matter that could have been due to small vessel ischemic disease. AR 296.

On August 24, 2010, Deborah Ohanesian, Ph.D., completed a short-form mental evaluation specifically intended for Plaintiff's disability claim. AR 298-300. Dr. Ohanesian wrote that she had examined Plaintiff on August 4, 2010, and August 24, 2010, but noted that Plaintiff had not started psychotherapy treatment with her yet, only evaluation. AR 298, 300. The psychologist described Plaintiff's current mental status examination as showing normal motor activity, cooperative behavior, slightly distracted concentration, average intelligence, depressed mood, flat affect, normal perception, goal-directed thoughts, obsessions, and moderately impaired judgment. AR 298-299. Plaintiff reported no alcohol use for the last one and a half years after forty years of abuse. AR 299. Dr. Ohanesian opined that Plaintiff had a fair[4] ability to perform the following functions: understand, remember and carry out simple and complex instructions; maintain concentration, attention and persistence; perform activities within a schedule and maintain regular attendance; complete a normal workday and workweek without interruptions from psychologically based symptoms; and respond appropriately to changes in a work setting. AR 300.

Also on August 24, 2010, L. Kiger, M.D., a state agency physician, reviewed the medical evidence of record and affirmed the prior findings that Plaintiff's physical impairments were nonsevere. AR 301-03. In particular, Dr. Kiger noted that, despite Dr. Mehdi's neurological examination findings suggestive of benign essential tremor, Plaintiff successfully completed his

---

[4] Dr. Ohanesian's form defined fair as "[t]he evidence supports the conclusion that the individual's capacity to perform the activity is impaired, but the degree/extent of the impairment needs to be further described." AR 300.

function report written for the state agency without tremulous-appearing handwriting, he stated he was able to eat cereal and play guitar, and his wife completed a written third-party function report that did not even mention tremors. AR 303. On September 3, 2010, A. Garcia, Ph.D., a state agency psychologist, affirmed the initial decision of first state agency psychologist that Plaintiff could perform simple, routine tasks despite his mental impairments. AR 302. Also on September 3, 2010, Plaintiff's application was denied at the reconsideration level. AR 87.

**September 2010-Present: Medical Records After Denial of Reconsideration**

Plaintiff met with Ramandeep Aulakh, PA-C, a clinician in Dr. Chann's office, on September 9, 2010, for medication follow-up. AR 305-08. Plaintiff reported that he was sleeping better. AR 308. His wife had experienced a stroke three weeks earlier and had decided to retire, prompting him to be fearful about the future. AR 305. Mr. Aulakh noted that Plaintiff was taking Depakote, Abilify, Wellbutrin, and Naproxen. *Id*. On mental status examination, he had appropriate eye contact, average psychomotor activity, and spontaneous speech, and he was cooperative with the examiner. AR 306. Although Plaintiff had labile affect and fearful mood due to worries about the future, his thought processes were goal-directed, and he had no perceptual abnormalities or delusions. *Id*. Plaintiff displayed satisfactory attention/concentration, was not distractible, his insight and judgment were intact and his impulse control was good. *Id*.

Plaintiff met with Dr. Chann on October 18, 2010. AR 348-50. Dr. Chann noted that Plaintiff was denied Social Security Disability and had concerns about income. AR 349. Dr. Chann believed Plaintiff lacked pleasure and motivation. *Id*. On mental status examination, he had appropriate eye contact, average psychomotor activity, and spontaneous speech, and was cooperative. AR 349. Dr. Chann did not indicate irritable, anxious, sad, or angry mood, or flat, labile, or inappropriate affect. *Id*. Plaintiff had no perceptual abnormalities or delusions. *Id*. He displayed fair attention/concentration and variable distractibility; however, his cognition, insight, and judgment were intact, and intelligence was average. *Id*. Impulse control was fair due to alcohol. *Id*. Dr. Chann diagnosed bipolar affective disorder and alcohol dependence. AR 350. The doctor identified several therapeutic interventions and recommended medication management. *Id*.

On October 26, 2010, Plaintiff met with Dr. Chann again. AR 344-45. On mental status examination, Plaintiff had appropriate eye contact, average psychomotor activity, and spontaneous speech, and was cooperative. AR 345. Plaintiff said that he felt anxious and irritated; however, Dr. Chann did not indicate irritable, anxious, sad, or angry mood, or flat, labile, or inappropriate affect. *Id*. Plaintiff had no perceptual abnormalities, his thought content was appropriate, and his thoughts were goal-directed. *Id*. Dr. Chann noted that Plaintiff's attention/concentration was fair, and his distractibility variable, but his cognition, insight, and judgment were intact, and his intelligence was average. AR 345. Dr. Chann again diagnosed bipolar affective disorder I (mixed) and alcohol dependence. AR 346. Plaintiff's treatment plan was medication management. *Id*.

On November 15, 2010, Plaintiff returned to Dr. Chann and complained of restless sleep and feeling tired. AR 340. Plaintiff's wife told Dr. Chann that Plaintiff used to be mistrustful of her and had "suspicions." *Id*. Dr. Chann increased Plaintiff's Abilify dosage because he was suspicious of his wife. *Id*. On mental status examination, Plaintiff had appropriate eye contact, average psychomotor activity, and spontaneous speech, and he was cooperative. AR 341. Plaintiff was irritable and tired. *Id*. Plaintiff had some feelings of guilt, but had no hallucinations or illusions, and his self-perception was within normal limits. *Id*. Plaintiff's attention/concentration was fair, and his cognition, insight, and judgment were intact. *Id*. Dr. Chann again diagnosed alcohol dependence and bipolar affective disorder. AR 342. Dr. Chann noted that the treatment plan for his symptoms of tiredness and sleepiness were medication management. *Id*.

On January 16, 2011, Plaintiff met with Dr. Chann again. AR 336-38. Plaintiff was apparently out of medications and had problems sleeping. AR 336. Dr. Chann prescribed Celexa, Abilify, Depakote, and Naproxen. *Id*. On mental status examination, Plaintiff had appropriate eye contact, average psychomotor activity, and spontaneous speech, and was cooperative. AR 337. He had an irritable mood and labile affect. *Id*. He had no hallucinations, illusions, or delusions, and his thoughts were goal-directed. *Id*. Dr. Chann did not observe any issues with attention/concentration. *Id*. Dr. Chann wrote that he discussed in detail with Plaintiff his need to eat healthy and exercise and encouraged him to get back to his meeting and set up a routine. AR 338. Plaintiff noted that he had no side effects from his medications of Celexa, Naproxen, and Abilify. AR 339.

More than five weeks later, on February 24, 2011, Dr. Chann completed a check-box form without any narrative explanation for his choices. AR 329-30. Dr. Chann opined that Plaintiff was markedly limited in his abilities to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with others without being distracted by them, complete a normal work and worked without interruptions from psychologically based symptoms, get along with co-workers or peers without distracting them, and respond appropriately to changes in the work setting. AR 329-30.

Dr. Chann also opined that Plaintiff was moderately limited in his abilities to remember locations and work-like procedures, perform activities within a schedule and maintain regular attendance, sustain an ordinary routine without special supervision, make simple work-related decisions, interact appropriately with the general public, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, maintain social appropriate behavior and adhere to basic standards of neatness and cleanliness, and be aware of normal hazards and take precautions. AR 329-30.

Dr. Chann also opined that Plaintiff was mildly limited[5] in his abilities to understand and remember very short and simple instructions, travel to unfamiliar places and use public transportation, and set realistic goals or make plans independently of others.

On March 4, 2011, Plaintiff saw Dr. Chann and said he had started going to meetings. AR 332. He was feeling sluggish. AR 332. However, he reported he was sleeping well. AR 335. On mental status examination, he had appropriate eye contact, average psychomotor activity, and spontaneous speech, and was cooperative. AR 333. His affect was sluggish and tired, and his mood anxious; however, Dr. Chann did indicate blunted, flat, or labile affect, or sad, angry, fearful, or irritable mood. *Id*. Although Dr. Chann noted some excess worry, Plaintiff had no hallucinations or illusions, and his thoughts were goal-directed. *Id*. Dr. Chann noted Plaintiff's attention/concentration as fair, and his distractibility variable, but his cognition, insight, and

---

[5] In his brief, Plaintiff wrote—incorrectly—that "mildly limited" on Dr. Chann's form represented "[a]n impairment which seriously interferes with the individual's ability to perform the designated activity on a regular and sustained basis" (Plaintiff's Brief at 11, citing AR 328). In fact, this is the definition applicable to "moderately limited." *See* AR 328. "Mildly limited" means that an impairment "mildly limits the individual's ability to perform the designated activity on a regular and sustained basis." AR 328.

13

judgment were intact, and his intelligence was average. *Id*. Dr. Chann diagnosed bipolar disorder not otherwise specified and alcohol dependence. AR 334. The treatment plan was medication management and seeing Dr. Guzzetta. *Id*. He was advised to exercise and eat healthy. *Id*.

**Plaintiff's Testimony**

Plaintiff testified before the ALJ on July 12, 2011. Physically, he said he suffered from gout that affected his ankles and toes. AR 41. When he got flares of gout he could not walk. AR 42. He was also seeing a psychiatrist, Dr. Chann, and had been diagnosed as bipolar. AR 43. He testified that he suffered from bouts of depression where he would not want to do anything and would get very moody and angry. *Id*. He did not like being around people or crowds. AR 44. His bouts of depression could last for two weeks to a month. *Id*. At other times he could do "some kind of light stuff around the house." *Id*. He said he could not concentrate for more than 10-15 minutes at a time and that he did not find much pleasure doing things anymore like playing the guitar. AR 47. His wife managed their finances. He had a problem staying awake due to medication. AR 44-45.

**Testimony of Vocational Expert**

At the hearing, Judith L. Najarian, a vocational expert, described how various mental and physical limitations would impact Plaintiff's ability to work. *See* 20 C.F.R. §404.1560. First, she considered whether a person with these limitations and Plaintiff's work experience could return to that past work. If not, she further considered whether that person, given Plaintiff's age and education, could adjust to new work.

In making this analysis, she characterized Plaintiff's past relevant work as child monitor (DOT# 301.677-010) and livestock attendant (DOT#410.674-018). She testified that a person with the limitations found by the ALJ could perform the work of commercial cleaner (DOT#381.687-014); ice packer (DOT#922.687-046); and tin stacker (DOT#922.687-098). AR 49-50.

**IV.  Disability Standard**

To be disabled, a claimant must have impairments which foreclose all meaningful employment for at least twelve months. 42 U.S.C. § 1382c(a)(3). To make the disability determination more uniform and efficient, ALJs follow a five-step "sequential evaluation process," stopping once they reach a dispositive finding. 20 C.F.R. §§ 404.1520, 1594(b)(5).

The sequential process begins with a "*de minimis* screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir.1996). At steps one and two, the claimant must verify that he is not meaningfully employed and in fact has severe impairments. Once a he passes this screening, the remaining steps examine whether he is disabled.

The claimant may prove this in two ways. One way—considered at step three—is to have a condition that is disabling by definition. *See* 20 C.F.R. Pt. 4, Subpt. P, App. 1 (the "listings"). Failing this, he must present evidence of his residual functional capacity ("RFC," the most he can do despite his limitations). The ALJ determines this RFC, then at steps four and five applies this to the world of work. If the claimant's RFC forecloses his past work, and if the Commissioner cannot satisfy her burden to identify a significant number of other jobs that the claimant could learn, then the claimant is disabled.

**V.      The ALJ's Decision**

The ALJ followed the five-step sequential evaluation process outlined above. At steps one and two, the ALJ found that Plaintiff's claim was not clearly meritless: he had not worked since the alleged date of disability and he had severe impairments capable of lasting twelve months. These included bipolar disorder, depressive disorder, a history of alcohol and polysubstance abuse, and tremors. His severe impairments did not include gout.

However, Plaintiff could not prove he was disabled. At step three, his condition did not meet or equal a "listing," and at steps four and five his RFC and vocational profile did not foreclose meaningful work. Plaintiff could perform a full range of work at all exertional levels subject to the nonexertional limitations to no fine manipulation, only simple routine tasks, and only occasional public contact. The ALJ identified a significant number of other jobs that Plaintiff could learn given his age, education, and experience—namely, those described by the vocational expert.

On appeal, Plaintiff argues that in evaluating his RFC, the ALJ did not give sufficient reasons for discounting the treating opinion of Dr. Chann.

/ / /

/ / /

## VI. Discussion

Plaintiff asserts that the ALJ gave insufficient reasons to reject the medical opinion of Dr. Chann. On February 24, 2011, Dr. Chann completed a check-box form without any narrative explanation for his choices. AR 329-30. The ALJ considered this opinion but gave it no weight.

As Plaintiff acknowledges, Dr. Chann's opinion has been contradicted by the opinions of other doctors. Reply brief at 9. To reject this opinion, the ALJ therefore only had to articulate specific and legitimate reasons supported by substantial evidence. *Orn v. Astrue*, 495 F.3d 625, 632-633 (9th Cir.2007). Possible reasons may include (1) the examining relationship; (2) the treatment relationship, including (a) the length of the treatment relationship or frequency of examination and the (b) nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors that support or contradict a medical opinion. 20 C.F.R. § 404.1527(d). Here, the ALJ cited supportability and consistency.

The ALJ observed that Dr. Chann's February 24, 2011 "check-box" form was not accompanied by "any explanation of the basis of his conclusions." AR 22. Instead, the only support was the records of Plaintiff's visits to Dr. Chann occurring between July 2010 and January 2011. AR 304-24, 331-51. The ALJ observed that these records "do not support his conclusions." She stated: "Because Dr. Chann's opinion is quite conclusory, providing very little explanation of the evidence relied on in forming that opinion, and his treating notes do not support his conclusions, they can be afforded no weight." The ALJ gave a specific example. Dr. Chann's notes repeatedly state that Plaintiff's attention/concentration was "fair" (the middle option between ""satisfactory" and "poor") and that his cognition was "intact." The ALJ refers to visits dated October 18, 2010 (AR 349), October 26, 2010 (AR 345), November 15, 2010 (AR 341), and March 4, 2011 (AR 333). (No findings in these categories were recorded on January 14, 2011. AR 337.) Yet, in the checkbox opinion, Dr. Chann identified a "marked" limitation in the area of concentration and attention—the most extreme of four options. AR 329. To the ALJ, the inconsistencies between the examining records and Dr. Chann's unexplained check-box opinion were grounds to doubt whether that opinion had the support of substantial evidence.

16

The ALJ properly referred to the contradictions between the check-box opinion and the treating records. *See Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (ALJ properly rejected a doctor's statement because the doctor's clinical notes and observations contradicted that statement); *see also Tommasetti*, 533 F.3d at 1041 (the ALJ properly found an "incongruity" between the doctor's questionnaire responses and the doctor's medical records; for example, the ALJ stated that the doctor's conclusions regarding the extent of the claimant's limitations "did not mesh with her objective data or history"). The ALJ also properly relied on the fact that Dr. Chann's check-box opinion form did not contain any explanation regarding the basis for its conclusions.[6] AR 22, 328-30. *See Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) ("the ALJ may 'permissibly reject[ ] . . . check-off reports that [do] not contain any explanation of the bases of their conclusions'") (*quoting Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996) (alterations in Molina). Plaintiff's observation that treatment records that did not accompany the doctor's statement might provide support for a few of the myriad functional limitations he assessed is unavailing (Plaintiff's Brief at 13). See 20 C.F.R. 404.1527(c)(3) ("The better explanation a source provides for an opinion, the more weight we will give that opinion; *Holohan*, 246 F.3d at 1202 (9th Cir. 2001) ("[T]he regulations give more weight to opinions that are explained than to those that are not"); *Batson*, 359 F.3d 1190, 1195 (9th Cir. 2004) (ALJ may discredit physician's opinions that are conclusory, brief, and unsupported by the record as a whole).

The ALJ also properly rejected Dr. Chann's opinion because it was inconsistent with other relevant evidence in the record. *See* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give that opinion"); *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (ALJ properly discounted treating doctor's limitations for being "so extreme as to be implausible" and "not supported by any findings"). For example, the ALJ noted observations made in July and September 2009 that Plaintiff felt fine, his mood seemed more stable, and his depression had improved. AR 20, 230-31. Furthermore, Dr. Damania, an examining physician, noted that although Plaintiff's mood was depressed, his affect was appropriate, he denied suicidal thoughts, his impulse control and frustration tolerance were

---

[6] Contrary to Plaintiff's straw man argument, Defendant never argues that check-box forms are null and void *per se*.

within normal limits, there was no evidence of hallucinations or delusions, his memory for recent and past recall was intact, his intelligence was average, he was aware of current events, he could do simple mathematics, and his insight and judgment were adequate. AR 223. The extreme limitations that Dr. Chann assessed are also inconsistent with Plaintiff's activities of daily living, which the ALJ noted in some detail. AR 24, 185-90.

Dr. Chann's opinion was also contradicted by the opinions of Drs. Fair and Garcia, state agency psychologists who are experts in disability analysis and who reviewed the entire record before making their assessments. AR 24, 273-291, 302. *See Bray v. Astrue*, 554 F.3d 1219, 1221, 1227 (9th Cir. 2009) (ALJ properly relied on the state agency physician's assessment in assessing the claimant's residual functional capacity and rejecting treating doctor's testimony regarding the claimant's functional limitations); *Thomas v. Barnhart*, 278 F.3d 948, 957 (9th Cir. 2002) ("The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record").

Plaintiff's poor credibility also provided supported for rejecting Dr. Chann's opinion. When considering whether a medical opinion is supported by objective evidence, an ALJ may disregard an opinion which is premised to "a large extent" upon the claimant's discredited complaints. *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir.1999). Here, Dr. Chann did not identify the bases for his opinion, so it is not possible to determine whether he relied upon subjective complaints to "a large extent." However, he did record specific subjective complaints. Insofar as these might have formed a significant basis for Dr. Chann's decision, the ALJ could consider Dr. Chann's possible reliance on these observations as a factor.

The ALJ identified frequent inconsistencies in Plaintiffs' descriptions of his daily activities. AR 24-25. At the hearing, Plaintiff testified that he was depressed most of the time and did not do anything during the day except sleeping, although if he felt well he would do some light "stuff" around the house. AR 19, 43-44. However, elsewhere in the record, Plaintiff admitted that he walked the dog two times per day, cleaned his apartment, washed clothes, did dishes, cleaned the bathroom, fed the dogs, did crossword puzzles, played guitar, performed laundry, went on walks, made sandwiches, and heated up leftovers. AR 24, 185-86. In addition, he walked around the block,

shopped for groceries, could sometimes mow the lawn, fixed minor things around the house, kept the house "really clean," and could lift 30 pounds. AR 24, 190. He also engaged in work activity after the alleged onset date, which to the ALJ indicated that his daily activities "have, at least at times, been somewhat greater than [Plaintiff] has generally reported." AR 25. In addition, his statements concerning his drug and alcohol abuse were "inconsistent at best." AR 25. Plaintiff repeatedly reported sobriety dates which he knew to be false, including in his testimony to the ALJ. AR 19, 25. As Dr. Murphy observed in April 2010, Plaintiff's addiction to illegal drugs and alcohol was "quite severe and there is only his word that it is no longer a problem." AR 271. The ALJ also commented upon Plaintiff's demeanor at the hearing, and noted that while Plaintiff claimed to be unable to concentrate for more than 10 to 15 minutes at a time, he was able to pay attention and respond appropriately throughout the hearing which lasted over 30 minutes. AR 25.

Contrary to Plaintiff's assertion, reliance on credibility is not a *post hoc* argument. Summarizing Plaintiff's credibility, the ALJ observed that "The description of the symptoms and limitations which the claimant has provided throughout the record has generally been inconsistent and unpersuasive." AR 25. She also specifically criticized a variety of medical records between March 2009 and January 2011 for the fact that they "merely reported the claimant's subjective complaints." AR 20-21. Although the ALJ did not specifically refer to Dr. Chann in this discussion, an ALJ need not "recite" an explanation using "magic words" so long as she presents an explanation clearly enough for the Court to make "specific and legitimate inferences from the ALJ's opinion." *Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989) (inferring grounds for rejecting expert's opinion from ALJ's discussion of the contrary opinions of other experts). It is legitimate to infer that the ALJ's critique of Plaintiff's allegations "throughout the record" included those made to Dr. Chann. Plaintiff cites *Ryan v. Commissioner*, 528 F.3d 1194, 1199 (9th Cir. 2008) for the proposition that this logic does not satisfy the "clear and convincing reasons" standard. Here, however, where the medical opinion has been controverted and the ALJ need only supply "specific and legitimate reasons," Courts have acknowledged that an ALJ may disregard medical opinions when they are based on discredited subjective complaints. *See Franklin v. Colvin*, 2013 WL 4396743 (N.D. Cal. Aug. 13, 2013) (distinguishing *Ryan* on these grounds).

The ALJ also noted that Dr. Chann's treatment notes were "generally illegible." AR 22. Although Plaintiff identifies cases where remand was ordered due to illegible or incomplete records, none of these cases is comparable to the present case. *See Galloway v. Astrue*, 2009 WL 1740647 (C.D. Cal. June 17, 2009) (a "substantial portion of the treating medical evidence could not be properly evaluated because it was illegible"); *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) (a medical expert testified that a record may not have been sufficiently complete to render a decision); *Miller v. Heckler*, 756 F.2d 679, 680 (8th Cir. 1985) ("the record contains nothing more than handwritten entries, which are in large part illegible"); *accord Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) ("An ALJ is required to recontact a doctor only if the doctor's report is ambiguous or insufficient for the ALJ to make a disability determination. ... The ALJ, with support in the record, found the evidence adequate to make a determination regarding Bayliss's disability. Accordingly, the ALJ did not have a duty to recontact the doctors.)

The issue here is simply that portions of the existing records from one treating source are indiscernible. However, Plaintiff admits that the mental status examinations are legible (Plaintiff's Brief at 12), and ALJ adequately summarized several of the treating records in his decision (AR 21). Plaintiff's proposal that ALJs should be required to call treating doctors every time a portion of their treatment notes are illegible, even if their medical opinions are discernible, is not supported by any of the case law he cites, nor would it make wise policy.

### VII. Conclusion

The ALJ applied appropriate legal standards and substantial credible evidence supported the ALJ's determination that Plaintiff was not disabled. Accordingly, the Court hereby AFFIRMS the agency's denial of benefits. The Clerk of Court is directed to enter judgment for Defendant Carolyn W. Colvin, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **December 11, 2013**          **/s/ Sandra M. Snyder**
                                         UNITED STATES MAGISTRATE JUDGE

20